UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS ELLIS NEWSOME,<br><br>                    Plaintiff,<br><br>v.<br><br>BRENT REINKE, JAY NIELSON,<br>ROBIN SANDY, WARDEN BLADES,<br>IDAHO DEPARTMENT OF<br>CORRECTION, NURSE<br>PRACTITIONER PAULSEN, DR.<br>YOUNG, WILLIAM WINGERT, and<br>JOHN DOES -2,<br><br>                    Defendants. | Case No. 1:13-cv-00511-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

**INTRODUCTION**

On December 3, 2013, Plaintiff filed a complaint against Defendants alleging violations of his Eighth Amendment rights. The Court in its initial review order filed on April 25, 2014, permitted Plaintiff to proceed against Defendants Nurse Practitioner Poulson,[1] Dr. Young, and Nurse William Wingert regarding his claims of deliberate indifference to his serious medical needs concerning his back and neck condition. In its

---

[1] Plaintiff apparently misspelled Nurse Practitioner Poulson's name in the caption. Poulson's affidavit, at Dkt. 32-3, indicates the correct spelling.

**REPORT AND RECOMMENDATION  - 1**

scheduling order filed on September 23, 2014, the Court required all motions for summary judgment to be filed no later than 210 days after entry of the order, and required responsive briefs to be filed within thirty days thereafter. (Dkt. 24.)

Defendants filed their motion for summary judgment on April 21, 2015, asserting the claims against Defendants are subject to summary dismissal because there was no Eighth Amendment violation. (Dkt. 32.) Plaintiff did not file a response contesting Defendants' motion for summary judgment by the response deadline, although Plaintiff was provided with notice from the Court regarding the summary judgment rule requirements on April 22, 2015, and Defendants' certificate of service indicates they mailed Plaintiff a copy of the motion and supporting documents on April 21, 2015.

On December 7, 2015, the Court gave notice to Plaintiff of its intent to grant Defendants' summary judgment motion without benefit of a response, but first granted Plaintiff an additional fourteen days to file his response in opposition to the motion. Plaintiff did not file a response, and the motion for summary judgment is now ripe for review.

Because Plaintiff failed to file an opposition to Defendants' assertions of fact, and the Court gave Plaintiff an additional opportunity to file a response, the Court considers the facts as set forth by Defendants undisputed for purposes of the motion. Fed. R. Civ. P. 56(c)(2). The Court will recommend that the district judge grant summary judgment on the grounds that the motion and supporting materials show that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(3).

**REPORT AND RECOMMENDATION  - 2**

## FACTS

On June 28, 2012, Plaintiff was processed upon initial incarceration. He stated that he currently had left leg issues and back and neck pain. (Affidavit of William Poulson, NP-C ¶ 3, Dkt. 32-3). Plaintiff was seen by Ben Bish, P.A.-C, on July 3, 2012. (*Id*. ¶ 4). Bish noted Plaintiff's spine to be within normal limits. He found no neurological deficits. He noted Plaintiff complained of left calf tenderness and reported having a clot in the calf. Bish prescribed medications, including Neurontin. (*Id*.)

Plaintiff was seen by Matthew Valley, P.A.-C, on July 27, 2012, concerning his complaint of chronic back pain. (*Id*. ¶ 5). Plaintiff reported previous lumbar and cervical fusion procedures and that Neurontin was not helping him. He also complained of left leg claudication and previous vascular surgeries on the right leg. Claudication is pain and/or cramping caused by decreased blood flow. No neurological deficits were noted. Valley discontinued Neurontin and prescribed Mobic for Plaintiff's back pain. (*Id*.)

Plaintiff was seen on August 7, 2012 by Katrina Bentley, NP-C, for complaints of back and hip pain. (*Id*. ¶ 6). Plaintiff stated that he felt his spine was compressing and that he felt a pop when he bent the wrong way. He also reported a burning pain sensation. Bentley ordered x-rays to rule out problems with the hardware used in connection with Plaintiff's previous spinal surgeries. On August 7, 2012, X-rays were performed on Plaintiff's entire spine (cervical, thoracic, lumbar, sacrum, and coccyx). The x-ray report noted no problems with hardware in the cervical or lumbar spine. (*Id*.).

On August 13, 2012, Poulson saw Plaintiff related to complaints about his leg. (*Id.* ¶ 7.) Poulson noted a Doppler study performed at St. Luke's confirmed reduced blood

flow in Plaintiff' left leg. Poulsen submitted a request for Plaintiff to be seen by a vascular surgeon.

On December 6, 2012, Plaintiff had a left leg artery procedure. Plaintiff was returned to the prison where he experienced right leg symptoms. (*Id*. ¶ 10). He was transferred back to the hospital and a right leg artery procedure was performed. (*Id*.).

On December 31, 2012, Poulson saw Plaintiff for the first time for Plaintiff's complaints related to his spine. (*Id*. ¶ 11). Plaintiff reported falling in 2011 at a prison in Arizona and herniating four discs. He reported experiencing bilateral posterior buttocks, thigh, and lateral calf pain, which was greater on the right than left. Plaintiff reported no bowel or bladder problems. Plaintiff stated that he thought the hardware in his spine had moved. He reported having an MRI at St. Luke's Tempe, Arizona. Poulson noted that Plaintiff ambulated well and that he had recently had the left leg artery procedure. Poulson noted Plaintiff's toe standing was okay with slightly weaker right plantar flexion/extension. Plaintiff's deep tendon reflexes were 2+ times 4 in the lower extremities, which meant his reflexes were normal at the knees and ankles on both legs. Plaintiff exhibited no foot drop or drag. Diminished deep tendon reflexes, foot drag or drop are signs of spinal cord compression. Poulson's plan was to obtain records from the Arizona Department of Corrections and follow up with Plaintiff once these were received.  Poulson also noted Plaintiff's symptoms were principally pain without weakness, which made a neurosurgical consult elective. (*Id*.).

 Poulson saw Plaintiff on January 11, 2013.  Poulson noted that they had not yet received the information relating to the previous back MRI. (*Id*. ¶ 12). Plaintiff reported

that his symptoms were stable and he had no bowel or bladder complaints or saddle anesthesia. He reported localized lumbar pain and intermittent right sciatic symptoms involving the right hip and thigh.  Poulson noted that Plaintiff ambulated well with a cane. His assessment was that Plaintiff had chronic low back pain. He noted that Plaintiff's previous fusions were reported to be stable on x-ray performed on August 7, 2012.  Poulson discussed with Plaintiff the risks and benefits of a prescription of Pamelor (Nortriptyline) for his back pain, which Plaintiff stated he would like to try.  Poulson reviewed the chart and noted that Plaintiff was to start Elavil. He decided they would fist follow Plaintiff's symptoms on Elavil and then consider Pamelor as needed. Pamelor and Elavil are both used for chronic back and nerve pain. (*Id.*).

Poulson saw Plaintiff on January 22, 2013, for review of his records from Arizona, but they were not available at that time. (*Id.* ¶ 13). These records were received on February 13, 2013. (*Id.*). Plaintiff continued to have left leg claudication symptoms and on March 20, 2013, Plaintiff had another left leg artery procedure, which was followed by a lengthy stay in the infirmary. (*Id.* ¶ 14, 43).

Poulson met with Plaintiff on April 17, 2013, for follow-up from his artery procedure. (*Id.* ¶ 16).  Poulson did not specifically address Plaintiff's spinal complaints or his Arizona records at this visit because the visit was limited to post-vascular surgery follow up.

Plaintiff was seen on May 8, 2013, by P.A. Valley for review of the 2011 MRI performed in Arizona. (*Id.* ¶ 18). Plaintiff reported that his primary symptoms involved right leg pain and he felt this was secondary to hardware movement caused by a fall he

experienced in December, 2011, which was after the MRI. Plaintiff also expressed

concern that the hardware used in the spinal fusions performed in 2010 had possibly been

recalled.  Valley noted certain findings of the 2011 MRI, including that the hardware was

in good position.  Valley's assessment was L-5 spine pain, cervical pain, and subjective

right-sided sciatic symptoms.

P.A. Valley noted also that recent x-rays of the cervical and lumbar spine showed

good alignment and no loosening of the internal hardware. He noted that there was no

appreciable weakness on examination and no clonus in the lower extremities. Clonus and

muscle weakness can be indications of spinal cord injury. Valley noted that Plaintiff

stated that use of a TENS unit and Elavil had previously helped with his symptoms.

Valley discussed with Plaintiff the goal of a 50% reduction in pain to help him

functionally but that achieving a pain level of zero was not likely. He ordered a TENS

unit and Pamelor for Plaintiff's spinal complaints.  Valley noted that Plaintiff was happy

with this plan of care. (*Id.*).

Poulson saw Plaintiff on May 10, 2013, for complaints of acute chest pain.

Plaintiff appeared comfortable and did not have signs or symptoms of a heart attack. (*Id.*

¶ 19). During this visit for cardiac evaluation of acute chest pain, Plaintiff brought up that

he had current claudication discomfort in the lower extremity and stated that "surgery

didn't work and he knew it wouldn't." (*Id.*).

Poulson saw Plaintiff on June 24, 2013 for his complaint of unresolved back pain.

(*Id.* ¶ 21). Plaintiff reported having excellent relief with Elavil but this was discontinued

and he was now taking Paxil and Pamelor. Plaintiff reported that his pain was worse at

**REPORT AND RECOMMENDATION  - 6**

night and he complained of right hip and buttock lateral radiculopathy. Plaintiff reported

no bowel or bladder complaints and no weakness.  Poulson noted that Plaintiff accessed

the examination table easily. His deep tendon reflexes in the lower extremities were

normal. He could go up on his toes.  Poulson's assessment was low back pain with

radiculopathy. He prescribed Mobic (an NSAID) and APAP.  Poulson noted that he

would ask the mental health providers whether Plaintiff was a candidate for a Serotonin-

Norepinephrine Reuptake Inhibitor, for the dual purpose of depression and pain

management. (*Id*.).

Poulson saw Plaintiff on June 28, 2013, for his complaint of numbness in the

groin and leg. (*Id*. ¶ 22). Plaintiff stated that his left calf claudication symptoms were

unchanged after the arterial procedure in March. Plaintiff also complained of left groin

burning pain, which appeared to be a new complaint.  Poulson's assessment was

peripheral vascular disease. He noted Plaintiff would be seen in follow up by Dr.

Symonds, his vascular surgeon, for further evaluation. (*Id*.).

On August 14, 2013, Poulson reviewed the report of cervical spine x-rays

performed on August 12, 2013. (*Id*. ¶ 26). The report noted the cervical fusions to be in

good alignment and no significant changes from the x-rays in August 2012. (*Id*.).

Poulson saw Plaintiff on August 22, 2013, for his complaint of bilateral parietal

headaches for the past two weeks. (*Id*. ¶ 27). His assessment was that Plaintiff was having

a tension headache.  Poulson noted that the medical record showed Plaintiff was recently

started on Elavil and was also taking Pamelor, which should not be taken together.  He

ordered that Pamelor be tapered and then discontinued. (*Id*.).

**REPORT AND RECOMMENDATION  - 7**

Poulson saw Plaintiff on August 28, 2013, for groin pain. (*Id*. ¶ 28). Plaintiff reported burning pain that radiated from his groin to his anterior left knee. He also complained of some left anterior thigh numbness. He reported these symptoms had been present for the past 4 to 5 days.  Poulson noted that Plaintiff's blood pressure was well controlled with the current medications. His examination revealed no palpable abnormality, tenderness, or erythema in the anterior thigh. Plaintiff's deep tendon reflexes and strength were normal in both legs.  Poulson's assessment was thigh pain, which he noted was expected to resolve.  Poulson also noted that this pain may have been referred from Plaintiff's back because he did not expect arterial occlusion at this time. He noted that Plaintiff would be seen in follow up if his condition failed to improve. It was unclear to  Poulson whether this new complaint was related to Plaintiff's vascular condition or his back. (*Id*.).

Poulson saw Plaintiff on September 3, 2013, in follow up after Plaintiff had lower extremity artery and carotid artery testing. (*Id*. ¶ 29)  Poulson noted that the exams showed no significant blood flow reduction and the symptoms Plaintiff reported in his left leg after walking would not appear to be related to arterial insufficiency. (*Id*.).

On September 9, 2013, Plaintiff was seen by Dr. Whinnery for follow up regarding his blood pressure. (*Id*. ¶ 30). She noted recent vascular tests were within normal limitations. However, Plaintiff reported that his claudication was getting worse. Dr. Whinnery's assessment was probable neurogenic claudication. Neurogenic claudication is calf pain caused by pressure on a nerve. Dr. Whinnery ordered physical therapy and lumbar x-rays to rule out spinal stenosis. (*Id*.).

**REPORT AND RECOMMENDATION  - 8**

Lumbar spine x-rays were performed on September 13, 2013. (*Id*. ¶ 31). The report notes the lumbar fusions to be in normal alignment and no hardware breakage. Severe disc loss was seen at L-5 to S-1, which was noted to be unchanged from the previous x-ray in August 2012. (*Id*.).

Poulson saw Plaintiff on September 30, 2013, for his back pain, which he reported was generally getting worse. (*Id*. ¶ 32). He reported that the TENS unit was helpful, but he was no longer allowed to use it "on the yard." Plaintiff also reported previously having good results with Neurontin.  Poulson noted that Plaintiff did not have foot drag or drop; his deep tendon reflexes were normal; and his muscle mass was symmetrical.  Poulson noted that his previous low back fusion was stable by x-ray. His assessment was low back pain with sciatica.  Poulson prescribed Neurontin. Plaintiff told Poulson that he did not wish to be evaluated for back surgery at this time but wanted to try the medication. Plaintiff's presentation did not mandate surgical consultation, but it was an option that could have been explored. While  Poulson does not recall exactly when it was implemented, at some point in time the IDOC no longer permitted inmates to possess TENS units. Corizon and its medical staff had no involvement with developing this policy. After the policy was implemented, access to TENS units was made available at the medical clinic.  Poulson does not know if Plaintiff went to the medical clinic to use a TENS unit after the policy went into effect. (*Id*.).

Plaintiff was seen by Dr. Whinnery on October 9, 2013. Plaintiff complained of pain in the left calf and thigh that was worse when he walked. (*Id*. ¶ 33). Dr. Whinnery noted that a recent cardiac nuclear stress test was within normal limits. Her assessment

was hypertension, severe hyperlipidemia, and chronic back pain with probable left leg neurogenic claudication. Dr. Whinnery reissued medication orders and noted that Plaintiff would be followed. (*Id*.).

Plaintiff was seen by Dr. Whinnery on October 23, 2013, with continuing complaints of burning pain in the left leg and groin after walking. (*Id*. ¶ 34). He explained that, when he stops and rests, the pain goes away. Dr. Whinnery adjusted Plaintiff's hypertension medication and noted that he would be followed in 90 days, or as needed. (*Id*.).

Plaintiff was seen by N.P. Schaffer on October 25, 2013, for left groin pain, which radiated down the left leg. (*Id*. ¶ 35).  Schaffer noted that Plaintiff had left leg pain without a mass. His plan was for Plaintiff to have an ultrasound of the left upper leg. (*Id*.).

On November 12, 2013, Plaintiff was seen by P.A. Takagi, who noted that Plaintiff would like to continue with the physical therapy that had been ordered by Dr. Whinnery. (*Id*. ¶ 36). He also noted that Plaintiff was resisting taking his morning and noon doses of Neurontin, because he reported it did not help, but he was taking the evening dose. Takagi's assessment was persistent back pain and he ordered continuation of physical therapy. He changed the Neurontin prescription to be provided only in the evening. (*Id*.).

On November 13, 2013, Poulson saw Plaintiff for his concern regarding hip pain. (*Id*. ¶ 37). Plaintiff reported right hip pain and ongoing sciatic pain.  Poulson noted that Plaintiff was about to be started on Clonidine and recently had started taking Vitamin D.

**REPORT AND RECOMMENDATION  - 10**

Poulson noted that he was hopeful these would help with Plaintiff's chronic pain complaints.  He noted that Plaintiff had limited external rotation secondary to right hip pain, with no crepitation. His assessment was right hip pain and he ordered an x-ray of the right hip.  Poulson discussed with Plaintiff raising the dosage of Clonidine for the possible dual benefit in treating Plaintiff's hypertension and for pain management (*Id*.).

Poulson saw Plaintiff on December 10, 2013, and noted physical therapy had not been helpful. (*Id*. ¶ 36). He also noted that a referral to Dr. Symonds was pending and that Pletal (medication for poor circulation) had begun. He noted that he would defer to Dr. Symonds for further management recommendations. Poulson ordered discontinuance of physical therapy. (*Id*.).

P.A. Poulson had no further involvement in Plaintiff's care and treatment after December 10, 2013. (*Id*. ¶ 42). After this visit, Plaintiff was transferred to ICC. Poulson has not made or influenced any decisions concerning Plaintiff's medical care since his transfer, and has no authority to do so. (*Id*.).

Dr. Murray Young is the Regional Medical Director for Corizon in Idaho. (Declaration of Murray Young, M.D. ¶ 2, Dkt. 32-10). A part of Dr. Young's duties is to review inmate medical records. (*Id*. ¶ 3). Dr. Young reviewed Plaintiff's records on August 21, 2013, August 27, 2013, and November 7, 2013. It would be uncommon for Dr. Young to conduct three chart reviews on one patient in a three month period, so he assumes Plaintiff's medical care was brought to his attention by the medical staff. It is clear that Plaintiff had multiple medical issues and the effect of his vascular conditions in combination with his spinal conditions complicated diagnosis of some of his complaints.

**REPORT AND RECOMMENDATION  - 11**

Dr. Young did not enter any notes concerning his chart reviews, which indicates he did

not have any questions or concerns about the manner in which Plaintiff's care was being

handled at that time. (*Id.*).

On or about December 12, 2013, Plaintiff was transferred to ICC. (*Id.* ¶ 4).

Corizon was not the medical provider at ICC in December of 2013. However, Corizon

became the medical provider at ICC on July 1, 2014. Between these dates, no Corizon

healthcare provider was involved in Plaintiff's care. However, ICC records reflect that,

on March 19, 2014, a CT scan was performed on Plaintiff's lumbar spine. On March 25,

2014, Dr. David Agler noted that he had reviewed the CT scan and the fusion looked

good and no major pathology was noted. On April 8, 2014, Dr. Agler noted that, based on

the CT scan, there was no indication for surgery. (*Id.*)

Dr. Young saw Plaintiff on July 11, 2014. (*Id.* ¶ 5). Plaintiff reported experiencing

pain since his back surgery in 2010. Dr. Young deferred a physical examination because

Plaintiff was in a wheelchair. Dr. Young noted that he would request an

orthopedic/neurosurgical consult with Dr. Montalbano. Dr. Young did this because of the

persistence of Plaintiff's complaints and because Plaintiff presented at this time in a

wheel chair. While there was no medical urgency related to Plaintiff's presentation, Dr.

Young wanted to get Dr. Montalbano's input. Dr. Young wanted to get Plaintiff out of his

wheelchair and he wanted an opinion of an independent doctor, which he thought

Plaintiff might be more likely to accept. (*Id.*).

On August 6, 2014, Plaintiff was seen by Dr. Montalbano, who recommended

MRI scans of Plaintiff's cervical and lumbar spine. (*Id.* ¶ 6.) On September 11, 2014, Dr.

**REPORT AND RECOMMENDATION  - 12**

Montalbano sent Dr. Young a report recommending a CT scan of the cervical spine because the MRI indicated possible pseudoarthrosis, which is a fusion that is not complete and solid. He commented that further treatment would depend on the results of the cervical CT scan. (*Id.*).

A CT scan of the cervical spine was performed on October 2, 2014, which was reported to show an incomplete incorporation of the bone graft at the C4-C5 level. (*Id.* ¶ 7). On October 8, 2014, Dr. Young received a letter from Dr. Montalbano recommending surgical correction of this condition. (*Id.* ¶ 8). Dr. Montalbano also recommended extending the fusion level of the lumbar spine at the level L3-4, which he noted could be addressed after the neck operation. (*Id.*).

On December 4, 2014, Dr. Montalbano performed a procedure to correct the prior cervical spine fusion. (*Id.* ¶ 8). On January 14, 2015, Dr. Montalbano wrote Dr. Young a letter reporting on his examination of Plaintiff on the same date. Dr. Montalbano reported that x-rays performed that date showed good results from the surgery and no evidence of hardware complications. Dr. Montalbano noted Plaintiff was doing quite well and his preoperative symptomatology had been relieved. (*Id.*).

Plaintiff did not exhibit clinical signs or symptoms of an urgent or emergent spinal condition. (*Id.* ¶ 10). According to Dr. Young, the procedure performed by Dr. Montalbano to correct Plaintiff's cervical fusion was not medically necessary. It was an elective procedure. Dr. Young decided to make the referral to Dr. Montalbano based on the persistence of Plaintiff's complaints. Dr. Young indicates he approved the procedure because the non-union of the prior fusion could have developed into a more serious

**REPORT AND RECOMMENDATION  - 13**

condition at a later date and he hoped it would alleviate Plaintiff's symptoms to an extent that would allow him to become more active, which he needed to be to help with all of his medical conditions.

Dr. Young indicates that the lumbar spine procedure recommended by Dr. Montalbano has been scheduled at this time. (*Id.* ¶10.) For security reasons, the actual date is not being disclosed, which is standard IDOC practice. This procedure also is an elective procedure. According to Dr. Young, the reasons for moving forward with this elective procedure are essentially the same as the reasons for performing surgery upon Plaintiff's cervical spine. (*Id.*).

William Wingert, R.N., is the Director of Nursing at ISCI. (Affidavit of William Wingert, R.N. ¶ 1).  Wingert saw Plaintiff on October 16, 2012, for his complaint of unresolved dizziness. (*Id.* ¶ 2). He reviewed Plaintiff' chart and called Dr. Whinnery, who gave orders for the continuation of Meclozine. As a registered nurse, Wingert is limited in the scope of his practice. He cannot diagnose medical conditions or prescribe treatment, except for certain limited medications, such as over the counter type medications. He cannot refer any patient to be seen by a specialist or to receive diagnostic testing. (*Id.* ¶ ).

In Dr. Poulson's opinion, Dr. Whinnery would not have ordered physical therapy if her evaluation of Plaintiff's spinal condition was that he had a condition mandating referral to a specialist. (Poulson Aff. ¶ 43.) An order for physical therapy is inconsistent with a spinal condition mandating urgent or emergent referral because the movements

associated with physical therapy could cause significant exacerbation of such a condition. (*Id.*)

Considering the substantial amount of surgery performed on Plaintiff's back and neck, it was not unexpected for him to have some chronic pain. (*Id.*).  Poulson believed they could find a successful pain management plan for Plaintiff. (*Id.*).

While  Poulson never saw a medical indication mandating that Plaintiff to be seen by a specialist, it is appropriate in some instances to refer a patient for a specialist's evaluation solely for pain symptoms. (*Id.*).

The 2011 Arizona MRI report did not show any problems with the hardware in Plaintiff's spine or other urgent or emergent spinal condition. (*Id.*). The MRI was substantially consistent with the findings of the x-rays performed in August 2012 and 2013 in Idaho. (*Id.*).

The care and treatment provided to Plaintiff by Poulson, Dr. Young, and  Wingert met or exceeded the standard of care. (Affidavit of William Poulson, NP-C ¶ 43; Declaration of Murray Young, M.D. ¶ 10; Affidavit of William Wingert, R.N. ¶ 5).

## DISPOSITION

### 1.    Eighth Amendment and Summary Judgment Standards

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Vague and conclusory allegations of official participation in civil rights violations are not sufficient. *See Ivey v. Board of Regents of Univ. of Alaska*, 673

F.2d 266, 268 ((9th Cir. Cir. 1982). Rather, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (there is no respondeat superior liability under §1983).

To state a claim under the Eighth Amendment, Plaintiff must allege facts showing that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiff must also state facts showing that Defendants were deliberately indifferent to the substantial risk of serious harm.

Deliberate indifference exists when an official knows of and disregards a condition posing a substantial risk of serious harm or when the official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws the inference. *Id.,* 511 U.S. at 837.

Not every claim by a prisoner that he has not received adequate medical treatment constitutes a constitutional violation. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

A prison official subjectively acts with deliberate indifference only if he knows of and disregards an excessive risk to inmate health and safety. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* (quoting *Farmer v.*

**REPORT AND RECOMMENDATION  - 16**

*Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994)). If the defendants are able to show that medical personnel have been consistently responsive to the inmate's medical needs, and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," a plaintiff's claims may be dismissed by summary judgment prior to trial. *Mintun v. Blades*, No. CV-06-139, 2008 WL 711636, at *3 (D. Idaho Mar. 14, 2008) (citing *Toguchi*, 391 F.3d at 1061).

"The Eighth Amendment does not provide a right to a specific treatment." *Id.* The Ninth Circuit has held that a mere difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Instead, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and that they chose that course in conscious disregard of an excessive risk to the plaintiff's health. *Id.* (citing *Farmer*, 114 S.Ct. at 1978-79); *see also Toguchi*, 391 F.3d at 1058. Moreover, "[a] difference of opinion between patient and physician, without more, does not state a claim under section 1983." *Shields v. Kunkel*, 442 F.2d 409, 410 (9th Cir. 1971).

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed." *Caplinger v. CCA*, 999 F.Supp.2d 1203, 1212 (D. Idaho 2014). "To show that the

**REPORT AND RECOMMENDATION  - 17**

material facts are not in dispute, a party may cite to particular parts of materials in the

record, or show that the adverse party is unable to produce admissible evidence to

support the fact." *Id.* (citing Fed.R.Civ.P. 56(c)(1)(A), (B)).

## 2.  Analysis

Plaintiff alleges Defendants failed to follow up with the Arizona Department of

Corrections on Plaintiff's medical needs while incarcerated at ISCI arising from prior

back and neck injuries. As a result, Plaintiff alleges he did not receive proper medical

care at the Idaho Department of Correction facility, causing further injury to his back and

neck. Plaintiff alleges that Defendants waited one year until they provided care for his

injuries, and then provided him only with a prescription for Neurontin. He was given a

TENS unit for a period of time, but then the TENS units were removed from the facility.

He was also given physical therapy, but it was not effective to change his symptoms. He

believes he needed to be taken to an orthopedic surgeon or other specialist to diagnose his

ongoing problems, including but not limited to extreme pain and burning in his right hip

and lower back, numbness in his left and right legs, burning pain down the left side of his

neck into his shoulder, difficulty walking, and an inability to turn his neck to the left

without extreme pain.

Poulsen had the greatest involvement in Plaintiff's ongoing medical care.

According to the providers that treated Plaintiff, and Dr. Young, who reviewed Plaintiff's

medical records, the care provided to Plaintiff met or exceeded the existing standard of

care. Plaintiff was seen on multiple occasions by providers, including two nurse

practitioners, three physicians' assistants, and a doctor. None of the providers, who were

**REPORT AND RECOMMENDATION  - 18**

primarily treating Plaintiff's acute vascular complaints at that time but who were aware of and also treating Plaintiff's back pain, saw the need to refer Plaintiff to an outside consultant for his spinal conditions. Objective medical tests, consisting of x-rays performed in August of 2012, did not indicate any acute problems with Plaintiff's back or neck warranting additional care beyond conservative pain management.

Further, the treatment notes and clinical evaluations conducted by Poulson and others did not demonstrate any acute conditions warranting referral to a specialist. The treatment notes do not indicate Plaintiff exhibited neurological signs or symptoms of any spinal conditions mandating referral to a specialist or for surgery. The treatment notes consistently indicate that Plaintiff did not complain of bowel or bladder problems; he had normal reflexes; and he did not have muscle wasting, foot drop, or drag.

Considering the substantial amount of prior surgical procedures performed on Plaintiff's back and neck, it was not unexpected for him to have some chronic pain. Poulson believed a successful pain management plan could be developed. Multiple different therapies were utilized to alleviate Plaintiff's pain, which included physical therapy, a TENS unit, and medication. Plaintiff reported successful treatment with Elavil and with the TENS unit. Plaintiff reported some success with NSAIDs, Neurontin and physical therapy. In other words, conservative pain management addressed Plaintiff's chronic pain condition.

The treatment records indicate that Neurontin was prescribed on June 3, 2012, less than one week after Plaintiff's initial incarceration on June 28, 2012. The medication was discontinued on July 27, 2012, because Plaintiff indicated it was not effective. Yet, when

Plaintiff informed Poulson on September 30, 2013, that Neurontin had previously been effective for him, and Poulson prescribed it. The dosage was reduced on November 12, 2013, when Plaintiff reported it was not helping.

None of the treatment records indicated an acute need related to Plaintiff's back symptoms for him to be seen for a specialist. Plaintiff never requested to see a specialist, and the treatment notes indicated that, on September 30, 2013, Plaintiff did not desire a referral to a specialist.

The treatment records from Arizona were first requested on December 31, 2012, when  Poulson first saw Plaintiff for his back complaints. The medical records were received on February 13, 2013, and upon review, the records did not show any problems with the hardware in Plaintiff's spine or an urgent or emergent spinal condition. The Arizona treatment records were consistent with the findings of the x-rays performed in August of 2012 and 2013 in Idaho.

The cervical surgery performed on December 4, 2014, by Dr. Montalbano was to correct a prior cervical spine fusion. The surgery was elective, and Dr. Montalbano noted Plaintiff was doing quite well post-surgery. There is no indication in the record that the decision to attempt conservative pain management first, prior to surgery, resulted in exacerbation of Plaintiff's condition. Further elective surgery to address Plaintiff's low back pain is scheduled.[2]

---

[2] Defendants indicate Plaintiff was scheduled for further surgery. It is not clear whether the lumbar surgery occurred before the Court's report and recommendation was finalized.

**REPORT AND RECOMMENDATION  - 20**

## CONCLUSION

Based upon the above, there are no disputed issues of material fact to indicate the course of treatment the medical care providers chose was medically unacceptable under the circumstances, or chosen in conscious disregard of an excessive risk to Plaintiff's health.

## <u>RECOMMENDATION</u>

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 32) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: December 30, 2015

Honorable Candy W. Dale
United States Magistrate Judge